# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

-v-                            **Case No. 6:16-cr-176-Orl-18DAB**

SCOT ROUNDS,

        Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

SCOT ROUNDS through his undersigned counsel respectfully submits this analysis and information to support a downward variance sentence based on factors contained in 18 U.S.C. § 3553(a). Without objection, the advisory sentence under the United States Sentencing Commission Guidelines ("Guidelines"), *before* consideration of the Motion for Downward Departure filed by the United States under § 5K1.1 (Doc. 75), is 21-27 months imprisonment based on a total offense level 16 and a Category I criminal history. (Doc. 76, ¶¶ 28-38; ¶67). The non-custodial sentence sought and hereafter outlined better reflects the circumstances of MR. ROUNDS' offense, his characteristics and history, and his substantial cooperation because it is sufficient and not greater than necessary to fully accommodate all purposes of sentencing under 18 U.S.C. § 3553(a)(2).

1

**BACKGROUND, HISTORY AND CIRCUMSTANCES OF THE OFFENSE**:

Developers in early-to-mid 2000 created condominiums and apartment complexes to meet the demand produced by a sizzling economy. There was rampant time-sharing of vacation housing units near resort properties by the affluent and this seemed to be a good opportunity as well for the working class to acquire property for vacation and potential income. As the economy slowed, property merchants offered various legal incentives to purchasers, such as cash-back payments, use of clubhouses and/or free furnishings to boost lagging sales. The monetary incentives should have been, but too often were not, disclosed to mortgage lenders. Developers also unfortunately used other deceptive tactics, such as offering "no money down" sales of properties by themselves providing the purchaser with the "down payment" on loan applications and then recovering the money after the loan issued. If not properly disclosed to the lender, this practice was unlawful.

During this time, the banking and mortgage lending industry went from a solid and respected profession to something far, far less. Indeed, many once-reputable banks and mortgage companies trained their loan officers how to prepare and process loan applications for marginal buyers[1] so mortgage loans could issue to

---

[1] Most relevant here are regulations controlling "subprime" mortgages, generally meaning a mortgage loan made to a borrower with a credit profile weaker than that of a prime borrower. Due to the weaker credit profile, subprime borrowers have a higher likelihood of default and therefore, to acquire a loan, they have to pay higher interest rates to the lender than do borrowers with a good-credit rating.

risky buyers paying higher interest payments.  The banking industry referred to such unverified loans as "stated" and "liars" loans.  The buyers, lenders and loan officers all knew that the applications were inaccurate but too many people benefited from the deception to correct the practice.  The developers who sold their properties were happy to sell units and they did not complain about erroneous numbers. Buyers obtained the homes and properties they sought so they were happy and did not complain.  The banks made their money on the higher loan interest and they were happy and did not complain.[2]  The process was doomed because those with marginal ability to make high payments on the loans were the most likely to default on the payments if the economy waned.

It was during this time that SCOT ROUNDS ("MR. ROUNDS") became involved with the developers and managers of Saratoga Resort Villas ("SRV").  He at first believed that the condominium units offered legitimate opportunities for investors to acquire and then either reside in, or rent out, living quarters near popular local attractions.  He discussed with friends and family members the incentives involved in purchasing condominium units at SRV and received a commission when one of his referrals resulted in the sale of a condominium.  As the economy slowed, the figures at SRV did not add up, the loan applications became vague and incomplete,

---

[2] Courts presiding over cases involving "liar-loans" have pointed out that the banks issuing loans without verification "would be coauthors of their loss, since *had they required* proof of financial soundness from the borrowers they would not have refinanced the properties in question." ___United States v. Farano___, 749 F.3d 658, 666 (7th Cir. 2014) (Emphasis added).

3

and it became apparent to him that disclosure laws were routinely being broken in the sale of SRV condominiums. The deposits he made into buyers' accounts at the direction of others crossed the line and he knew it. Knowing that he was engaging in unlawful conduct, MR. ROUNDS in 2008 gave his materials to Marek Harrison, broke away from that group and sought other employment. Losing interest in being employed by others, he left the real estate business altogether. As explained in his letter to the Court, he started his own business distributing nutritional supplements, married and focused on being as good a person as he could be. (**Exhibit 1**).

MR. ROUNDS admits that, ten years ago, he committed bank fraud, an offense that does not require an intent to steal. The nature of his offense – bank fraud – is deceiving a federally insured lending institution about material facts on a loan application. The deception is the gravamen of bank fraud. Insofar as guilt, it matters not one whit whether MR. ROUNDS truly believed that purchasers would benefit from acquiring the condominium unit and fully repay the loans they. Cf. *United States v. Davis*, 989 F.2d 244, 246-47 (7th Cir. 1993) ("[T]he purpose of [the bank fraud statute] is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions."). That said, whether the person committing the bank fraud is actually a con artist or just someone who engaged in deception so that a loan would issue *does* matter when it comes to determining what sentence is sufficient and not more than necessary to punish him for his crime.

4

More specifically, in 2007-2008, "S.R.V. Associates" owned Saratoga Resort Villas[3] located in Kissimmee, Florida. "The Lux Group, LLC" managed S.R.V. Associates. (Doc. 76, ¶15). Marek Harrison, Brian Allard, and another person (not SCOT ROUNDS) controlled the Lux Group. MR. ROUNDS pled guilty to committing bank fraud specifically in connection with the December 2007 sale of SRV condominium unit 2825. (Doc. 55, pages 22-23) In that regard, MR. ROUNDS told a friend (Mr. Martelli) about the incentives offered at SRV and introduced him to Marek Harrison, the at-large co-defendant. Mr. Martelli, Marek Harrison and Brian Allard thereafter negotiated the specifics of the sale of that condominium and completed the loan applications. Later, at the direction of Marek Harrison, MR. ROUNDS deposited cash provided by a third party into Mr. Martelli's bank account so that the account balance matched assets shown on the loan application. By doing so he committed bank fraud in violation of 18 U.S.C. § 1344. His involvement in this and similar involvement (Doc. 76, ¶ 20) in other transactions at the direction Marek Harrison and/or Brian Allard form the circumstances of his offense.

The circumstances of his offense include viewing what transpired through the lens of what he did at the time of the conduct and not simply with the wisdom of hindsight. In that regard, Robert Shiller wrote a book titled "Irrational

---

[3] Best Western Motels now own the property and rents the units. (**Exhibit 13**).

Exuberance" and defined the term as "A heightened state of speculative fervor."  In

another article, Jeff Holt explains how irrational exuberance became commonplace:

> Since home prices had not fallen nationwide in any single year since the Great Depression, most people assumed that they would not fall.  This almost universal assumption of rising home prices led the participants who contributed to the housing bubble to make the decisions that created the bubble.   Government regulators felt no need to try to control rising home prices, which they did not recognize as a bubble.  Mortgage lenders continued to make increasing numbers of subprime mortgages and adjustable rate mortgages. These mortgages would continue to have low default rates if home prices kept rising.   Investment bankers continued to issue highly leveraged mortgage-backed securities.  These securities would continue to perform well if home prices kept rising.  Credit ratings agencies continued to give AAA ratings to securities back by subprime, adjustable rate mortgages.  These ratings, again, would prove to be accurate if home prices kept rising.  Foreign investors continued to pour billions of dollars into highly rated Mortgage-backed securities.  * * * Home buyers continued to purchase homes (often for speculative purposes) even though the monthly payments would eventually prove un-manageable.  They assumed that they would be able to 'flip' the home for a profit or refinance the loan when the adjustable rate increased.  This too would work if home prices kept rising.

Holt: A summary of the Primary Causes of the housing Bubble and the Resulting

Credit Crisis: A Non-Technical Paper", The Journal of Business Inquiry 2009, 8, 1

(120-129), page 126 (**Exhibit 12**). For reasons too numerous to mention, the

irrational exuberance that gripped the United States in 2008 no longer exists.

However, in 2008, it was tangible.  Most people simplistically believed that real

property and home prices would continue rising.  MR. ROUNDS' unlawful conduct is serious, but it does not reflect the type of evil, *malum en se* conduct that deserves overly harsh punishment.

In that regard, MR. ROUNDS voluntarily walked away from SRV, Marek Harrison and Brian Allard to begin a new career and start his own business that aligned with his interest and education in physical fitness and nutrition. When approached by law enforcement many years after the fact, knowing that he was admitting that he participated in criminal conduct, he fully cooperated and provided detailed information about the people, practices and transactions he recalled going on at SRV.  He timely notified the United States that resolution of his case would not require a trial, while one co-defendant (Marek Harrison) evaded apprehension and the other (Brian Allard) litigated[4] trial issues and expended judicial resources. MR. ROUNDS was the first defendant[5] to enter into a plea agreement (Doc. 57) and his cooperation saved judicial resources.  His willingness to admit guilt and testify caused co-defendant Allard to admit guilt.  His cooperation puts him at risk.

---

[4] For example, Mr. Allard sought a Bill of Particulars (Doc. 30) and, just before the scheduled trial, he objected to the United States' motion to exclude evidence of, and argument about, lender negligence that MR. ROUNDS did not oppose. (Docs. 44 & 45).  He also moved to extend the change of plea deadline (Doc. 51) after Mr. Rounds' notice of change of plea hearing had already issued. (Doc. 50).

[5] Although Mr. Allard's *undated* plea agreement was filed first (Doc. 54), his notice of change of plea followed Mr. Rounds' plea agreement dated May 3, 2017 (Doc. 57) and change of plea hearing on May 178, 2017. (Doc. 50).

As discussed in depth later, MR. ROUNDS strives to be a good husband, parent, citizen and lawful small business owner.   When this offense occurred in 2007-2008, MR. ROUNDS knew better than to engage in the practices so prevalent at that time in the mortgage loan industry.   He admits wrongdoing and accepts responsibility. (**Exhibit 1**).  He exercised poor judgment and engaged in criminal conduct that he remorsefully admits.  His motive was to *earn* money while helping others participate in what at that time seemed, and years later has proved to be under different management (Best Western – **see exhibit 12**),  a sound investment.  He engaged in fraudulent activity during his employment, but not the sort of evil activity exhibited by con men seeking to extract money from gullible people to line their own pockets while leaving the victims with nothing.  MR. ROUNDS engaged in fraudulent conduct – he deceived banks to issue a loan - so that people seeking to purchase condominium units could buy them, rent them, and participate in the economic boon occurring at the time.   He should receive punishment that is sufficient but not more than necessary under 18 U.S.C. § 3553(a) for what he did then and, importantly, what he has accomplished since then.

**History and Characteristics of this Defendant**:

MR. ROUNDS is 45 years old.  Although born in Virginia, he grew up in Colorado.  His education includes studying sports medicine at Colorado Technical University in Aurora, Colorado.  He has no criminal history and came to Florida in 2002 when he was 30 years old.

He and his wife of three years have a two-year-old son.  He is also the proud stepfather of two teenage boys who appear with their mother in **Exhibit 2**.   **Exhibit 3** shows the Rounds' family last Thanksgiving.  MR. ROUNDS' interest in family and sports appear in Composite **Exhibit 4**.   His interest in physical health and physical conditioning appear in **Exhibit 5**.   The business he began in 2010, "The Nutrition Corner Store", is a retail store chain that sells nutritional supplements to athletes located at gymnasiums and sports venues in Texas and Florida.   **Exhibit 6** is a photograph showing one of his store locations.

Letters to the Court describe MR. ROUNDS' characteristics that also shown in the photographs submitted as exhibits described above.  Specifically, his wife Laura Rounds describes how he conducts himself daily as a husband, parent and role model.  She explains how he cooks for them when her schedule requires it, and how he attends to his sons' emotional and educational needs.  "He has been there every step of the way since we have been together from my move to Orlando to start over. He has been my support when I needed someone to take the boys to school because my job entailed me to leave so early in the morning. Scot has been their father figure every step of the way." (**Exhibit 7**).

MR. ROUNDS' sixteen year-old stepson Chad Taylor is entering his senior year in high school and is involved[6] in the Student Government Association.  He

---

[6] **Exhibit 10** may provide insight into his stepson's interest in student government.

plans to become an engineer and hopes to attend the University of Florida.  He describes how, despite breaking MR. ROUND's toe the first time they met, SCOT ROUNDS has treated him and his brother "as if we were his own."  **(Exhibit 8)**.  He writes, "Ever since my real Dad left when [my brother] and I were little we never really had a father like figure in our lives * * *.  The moment Scot stepped into our lives it has been all different, he treats us with respect, he teaches us how to be great men in our lives.  He taught us to play sports and most importantly taught us how to treat the people around us, not just as family, but our friends." (**Exhibit 8**).

Brenda Iverson, MR. ROUNDS' mother-in-law, lives with the Rounds family and provides insight into their daily life and the family unit.  She offers the following as to MR. ROUNDS' character: "Scot married my daughter 3 years ago but has been with her for the last five years.  He came into their lives and took on her Laura's two boys with no hesitation.  He has always shown respect to them as if they were his own and been very active in their lives.  I tell you this because it has been very difficult for her boys over the years not having a father figure in their lives.  Scot has taught them to have integrity, to be honest, and to respect family and those around them.  Laura's oldest will be graduating high school in May 2018 and Scot has played an instrumental role in discussing adulthood and his journey he will fact in college." (**Exhibit 9**).

People outside the Rounds' home also believe that MR. ROUNDS is a "firm, loving and fair" parent. (**Exhibit 11**)  More specifically, in his letter to the Court,

Matthew Bond from Richmond, Virginia met Mr. Rounds during a family vacation in Long Island in 2012 and writes that Mr. Rounds "is a calm family man who cares deeply about his loved ones."   Mr. Bond comments, "The situation that Scot is facing before the Court was brought to my attention last year.  My impression is that he appears to be very contrite and incredibly embarrassed regarding this situation. Based on the information that was sent to me by the family, it appears that Scot has also shown remorse for his behavior, has assisted the government in prosecuting other defendants in this matter and has begun to make amends for his actions." (**Exhibit 11**).

## <u>The Guidelines Advisory Range</u>

Without objection, the advisory sentence under the United States Sentencing Commission Guidelines ("Guidelines"), *before* consideration of the Motion for Downward Departure filed by the United States under § 5K1.1 (Doc.  75), is 21-27 months imprisonment based on a total offense level 16 and a Category I criminal history.  Applying the two level reduction suggested in the 5K1.1 motion, the total offense level becomes 14 and the category I criminal history, the advisory range becomes 15-21 months.  The filing of the 5K1.1 motion authorizes this Court to accommodate MR. ROUNDS' timely substantial assistance that caused a more culpable co-defendant to plead guilty.  Those who enter a federal prison after cooperating with law enforcement face physical assaults and recrimination from inmates who live by a code of conduct specifically designed to discourage anyone

facing imprisonment from cooperating with law enforcement. It is brutally enforced and vigorously pursued when new inmates arrive at a Bureau of Prisons facility. Those who cooperate with law enforcement act at their own peril. MR. ROUNDS' cooperation is substantial, worthy, and it merits substantial reward that counters the efforts of prisoners to prevent cooperation. Recognition of cooperation by the judiciary by exercising leniency is an important incentive for defendants to cooperate.

## WHAT SENTENCE IS "SUFFICIENT" - DISCUSSION

18 U.S.C. § 3553(a) requires that the above-considerations, be used to determine what sentence is sufficient and not more than necessary to accommodate the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2). Empowered by this statute, district courts are to weigh various factors and "make an individualized assessment based on the facts presented." ***Gall v. United States***, 552 U.S. 38, 50 (2007). The statute requires considerations of the advisory guideline sentence. That range, without objection, is 21-27 months imprisonment based on a total offense total of 16 and a category I criminal history. (Doc. 76, ¶ 67). However, the United States filed a Motion for a Downward Departure pursuant to Rule 5K1.1 and recommended a two level reduction in the calculation of the total offense level and the PSR otherwise reflects the filing of the 5K1.1 motion as a factor that may warrant departure. (Doc. 76, ¶ 81). Although MR. ROUNDS has not yet had to testify, he has met with law enforcement and provided truthful information about SRV, its

members and transactions. Significantly, MR. ROUNDS provided information involving over 42,000 pages of discovery and explained documents, transactions and people known by and/or familiar to him.

His cooperation led directly to the change of plea by a defendant preparing to go to trial, and MR. ROUNDS remains available to testify truthfully when law enforcement apprehends the at-large and most culpable defendant, Marek Harrison. By cooperating, if MR. ROUNDS receives a sentence of imprisonment, he can expect recrimination and physical harm at the hands of inmates who seek to intimidate others from providing truthful information while cooperating with law enforcement. The gangs confined in prisons have the capability of communicating with others outside of prison and that places the families of cooperating witnesses at risk. The "5K1.1" motion openly filed on PACER is enough to bring MR. ROUNDS' cooperation to the attention of inmates who demand to review the "papers" of newly arriving inmates. Further, MR. ROUNDS immediately notified that United States that he would be entering a guilty plea and that no trial would be necessary. The factors listed in § 5K1.1(a) support a downward adjustment of at least five levels. If a total offense level 11 is used with no criminal history, the recommended sentence using the Guideline structure becomes 8-14 months.

That said, the Guidelines no longer "constrain" the discretion of district courts in determining what sentence is sufficient based on the 18 U.S.C. § 3553(a)

factors, and clearly any sentence recommended under the Guidelines is non-binding

and advisory only:

> The Guidelines were initially binding on district courts,
> *Booker*, 543 U.S., at 233, 125 S.Ct. 738, but this Court in *Booker*
> rendered them "effectively advisory," *id*, at 245, 125 S.Ct. 738.
> Although the Guidelines remain "the starting point and the initial
> benchmark" for sentencing, a sentencing court may no longer rely
> exclusively on the Guidelines range: rather, the court "must make
> an individualized assessment based on the facts presented" and
> other statutory factors. *Gall v. United States*, 552 U.S. 38, 49, 50,
> 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).  The Guidelines thus
> continue to guide district courts in exercising their discretion by
> serving as "the framework for sentencing," *Peugh v. United
> States*, 569 U.S. __, __, 133 S.Ct. 2072, 2083, 186 L.Ed 2d 84
> (2013), but they "do not constrain th[at] discretion." *Id*, at __, 133
> S.Ct., at 2089 (Thomas, J., dissenting).

**_Beckles v. United States_**, 580 U.S. ___, ___, 137 S.Ct. 886, 894, 197 L.Ed.2d 145

(2017).

**Sufficient Punishment under 18 U.S.C. § 3553(a)**:

"It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case

as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and the punishment to ensue." **_Koon v. United States_**, 518 U.S.

81, 113 (1996).  The four purposes of sentencing articulated in 18 U.S.C. §

3553(a)(2) guide what punishment will be "sufficient and not more than necessary"

given the circumstances of the offense and the characteristics of the offender.

18 U.S.C. § 3553(a)(2)(A) directs that the sentence imposed must **reflect the seriousness of the offense, produce respect for the law and provide just punishment for the offense.**    The offense, committed ten years ago, involved deception of banks to acquire home mortgage loans for buyers to acquire condominium units.  The fraud involved misrepresentations about the assets of the buyer and the financial details concerning purchase of the condominium, including the total cost.  This is a serious crime and the fact that the practice was prevalent does not diminish how serious bank fraud is.   The fact that bank fraud is a serious crime does not demand only a harsh sentence.

For instance, in **_Gall v. United States_**, 552 U.S. 38, 128 S.Ct. 586, 597 (2007), a defendant conspired to distribute at least 2,500 grams of ecstasy.  The district judge exercised his discretion and imposed 36 months of probation rather than imprisonment within the 30-37[7] month recommended range because, as explained in his sentencing order, the facts made probation a reasonable sentence. After the Eighth Circuit Court of Appeals reversed the probationary sentence, the Supreme Court granted certiorari and squarely held that the "experienced District Judge" _did not_ abuse his discretion by imposing probation and expressly held that probation under those facts _was indeed a reasonable sentence_:

> The Supreme Court held "that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts

---

[7] A sentence in the 30-37 month advisory range is outside of Zones A, B and C.

15

> of appeals must review all sentences - whether inside, just outside, or significantly outside the Guidelines range - under a deferential abuse-of-discretion standard. <u>We also hold that the sentence imposed by the experienced District Judge in this case was reasonable</u>.

**_Gall_**, 552 U.S. at 40, 128 S.Ct. at 591 (Emphasis added).

Simply said, the seriousness of the offense is one facet weighed against other considerations. As in **_Gall_**, this first-time offender left criminal activity on his own and improved himself. Acceptance of responsibility as in **_Gall_**, weighs in favor of leniency and, here, full and timely cooperation with law enforcement that resulted in a 5K1.1 motion demonstrate respect for the law. The letters to this Court from those who have known MR. ROUNDS after he committed this offense ten years ago, as well as his letter to this Court shows respect for the law through his actions and conduct. Indeed, the maturity, behavior and attitude of his children reflect MR. ROUNDS' respect for the law.

**Adequate deterrence to criminal conduct** does not require imprisonment to accommodate 18 U.S.C. § 3553(a)(2)(B). It seems patent that MR. ROUNDS' devotion to his family and incentive to be a good role model for his children is far more a deterrent to bad behavior than any period of confinement. Confinement is unnecessary to provide deterrence of future criminal conduct by MR. ROUNDS. Insofar as general deterrence, as with **_Gall_**, the fact that bank fraud and conspiracy to distribute controlled substances are serious crimes does not mandate

imprisonment.  Unlike some drug, firearm and child exploitation offenses, there is no mandatory minimum penalty that Congress could apply indicating that extraordinary general deterrence is necessary for bank fraud.

Imprisonment is unnecessary to **protect the public from further crimes committed by the defendant.** 18 U.S.C. § 3553(a)(2)(C).   The offense at conviction – bank fraud – did not involve weapons, force, threats, children or violence. More importantly, MR. ROUNDS voluntary walked away from engaging in criminal activity 10 years ago and has since operated a successful business that employs fifteen people. His criminal history does not suggest that a prison sentence is necessary to protect the public from crimes he shows no indication of committing in the future, and his performance while on pretrial release has been impeccable.

Imprisonment is unnecessary to **provide the defendant with needed medical and correctional treatment in the most effective manner.** 18 U.S.C. § 3553(a)(2)(D).   The need for "correctional treatment" suggests the need for rehabilitation.  MR. ROUNDS is self-employed, employs multiple other people, and is comporting himself in a way that shows further rehabilitation is unnecessary.  In ***Pepper v. United States***, 562 U.S. 476, 481, 131 S.Ct. 1229, 1236 (2011), the Supreme Court spoke about the worth of rehabilitation under 18 U.S.C. § 3553(a) and expressly held that district courts in a resentencing proceeding could consider a defendant's rehabilitation that occurred while serving a subsequently-vacated prison sentence.  The Court held "that such evidence may, in appropriate cases, support a

17

downward variance from the now-advisory Federal Sentencing Guideline Range." MR. ROUNDS' conduct for ten years demonstrates that imprisonment does not advance rehabilitation.

The sentence sought by MR. ROUNDS, specifically, is confinement in the custody of the Bureau of Prisons for one day, reflecting the time that he has been in custody, followed by three-years of supervised release. The PSR reflects that MR. ROUNDS' residence is suitable for supervision. (Doc.  76, ¶ 52).  As a special condition of supervised release, MR. ROUNDS should serve 15 days at the Brevard County Work Farm and serve 50 hours of community service.   Payment of $602,730 restitution should be required under the provisions of the Mandatory Victim Restitution Act of 1996, with interest waived due to inability to pay interest, payable jointly and severally with co-defendant Brian Allard.   Payments of restitution by MR. ROUNDS should be at $300 monthly unless the Court is notified of a material change in MR. ROUNDS' ability to pay. The payment of restitution can be revisited if co-defendant Marek Harrison is convicted in reference to this case. A $100 special assessment cost must be imposed.

**Conclusion**:   For all of the foregoing reasons and others that may be appreciated by the Court that undersigned counsel has failed to address, the factors under 18 U.S.C. § 3553(a)(2) are all accommodated by supervised release, physical labor at the Brevard County Work Farm, community service, and maintaining the successful operation of his business so that he will be able to pay restitution.  The

individualized sentence outlined that takes into account the circumstances of the offense that occurred ten years ago, MR. ROUNDS' rehabilitation since then, his acceptance of responsibility and his full cooperation with law enforcement at considerable risk to himself and family is sufficient and not more than necessary to accommodate the factors set forth under 18 U.S.C. § 3553(a).

Donna Lee Elm
Federal Defender

*Larry B. Henderson*
Larry B. Henderson
Assistant Federal Defender
Florida Bar #0353973
201 S Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338
Fax: (407) 648-6095
Email: larry_henderson@fd.org

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing was filed electronically on August 15, 2017, with the Clerk of Court using the CM/ECF system that will automatically send a notice of filing to A.U.S.A. Vincent Chiu.

Donna Lee Elm
Federal Defender

*Larry B. Henderson*
Larry B. Henderson
Assistant Federal Defender
Florida Bar #0353973
201 S. Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338

Fax: (407) 648-6095
Email: larry_henderson@fd.org